**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SARA HECKER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-6857 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Sara Hecker, a Chicago police officer, injured her knee in 2010 while placing a suspect in custody. So the Chicago Police Department assigned Hecker to desk-duty, where she sat for over a decade.

In October 2021, the Department asked Hecker to help with the Chicago Marathon. At first, she protested the assignment, but she felt forced into it. So she went along. Unfortunately, she re-injured her knee during the Marathon. Her reaggravated knee injury triggered a temporary leave of absence, and new workplace accommodations.

Hecker received a lukewarm reception upon returning to work. Her supervisor second-guessed her accommodations, and allegedly pressured her to leave his unit. She refused, and reported him for discrimination. Only a few days later, she went on unpaid leave.

Over the next several months, things grew increasingly acrimonious. Hecker fired a volley of internal complaints about her supervisors. She complained about not receiving certain medical care, and about getting subjected to workplace harassment. She believed that her supervisors mistreated her as retaliation for complaining, and after complaining some more, the retaliation got worse.

Eventually, Hecker received disability benefits. Hecker remains employed with the Chicago Police Department, but she hasn't performed any work since 2021. Even so, she claims that she could return to work on a permanent light duty assignment.

Hecker ultimately sued the City of Chicago, bringing five claims. She alleges discrimination based on her disability and sex, and retaliation. The City filed two motions, including a motion to dismiss under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c). The City argues that most of the claims are untimely, and that other claims fail to state a claim.

This Court previously converted part of the City's motion into a motion for summary judgment under Federal Rule of Civil Procedure 12(d). So, the Court reviews some of Hecker's claims under Rule 56, and the rest of the claims under Rule 12(b)(6).

For the following reasons, the motion for summary judgment and the motion to dismiss are granted, with one exception. The Court declines to exercise supplemental jurisdiction over the claims under the Illinois Whistleblower Act (which is part of Count II).

**Background**

Before diving in, the Court needs to have a little sit-down with the reader. The Court offers a quick procedural preview, and a forewarning.

For starters, the procedural posture is a bit of an odd duck. There are two motions, under two different rules. Part of this opinion will address a motion to dismiss, and part of the opinion will address a motion for summary judgment. But the Court will explain the procedural posture later, so stay tuned.

That's the easy part. Here's the hard part.

2

Hecker's complaint – which was filed by counsel – left a lot to be desired, to put it mildly. The complaint was disorganized, confusing, and chock-full of typos. To be blunt, and perfectly candid, the complaint is a brutal read.

The complaint goes back and forth, sometimes offering too much detail, and sometimes too little. The mix between granularity and vagueness creates a sense of disorientation, followed by whiplash. Grinding through the complaint is tough sledding on a muddy track. It leaves the reader demoralized and bewildered, creating a strong desire to flee to the hills, never to return.

At times, the story-telling is so herky-jerky that the Court feels compelled to break the "Fourth Wall" and reassure the reader that you're not missing anything. Actually, if you feel like you're missing something, you're not alone.

All too often, the reader loses the thread, if not the entire ball of twine. So, the Court will do its level best to rope the reader back in. If the storytelling seems imprecise or difficult to follow, you deserve credit for paying attention.

As a reminder, at the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

With that forewarning, here goes nothing.

## I.     Hecker's Light Duty and Marathon Assignment.

Sara Hecker served as a police officer with the Chicago Police Department for over fifteen years. *See* Am. Cplt., at ¶ 12 (Dckt. No. 31). In December 2010, Hecker injured her knee

while placing a suspect into custody. *Id.* at ¶ 24. The injury forced her to work with light duty restrictions. *Id.* at ¶ 25.

After the injury, the Department assigned Hecker to "desk duty" as an administrative assistant in the Intelligence and Bureau of Counterterrorism Department. *Id.* at ¶¶ 27–28. She held that role from the date of her injury until October 2021, nearly 11 years. *Id.* at ¶ 27. Beginning in 2020, RDO Chief Duane Devries directly supervised Hecker. *Id.* at ¶ 28.[1]

In October 2021, Chief Devries "forced" Hecker to work the Chicago Marathon. *Id.* at ¶¶ 29–31. Chief Devries repeatedly gave Hecker a written report called "The Incident Plan" in the days before the race. *Id.* at ¶ 32. He gave Hecker the report in an "effort to scare, intimidate, and force [her] to work" the Marathon. *Id.*

Hecker protested the assignment, but Chief Devries forced Hecker to work the Marathon. Chief Devries assigned her to work the race despite knowing about her disability. *Id.* at ¶¶ 30–31.

The Chicago Marathon took place on October 10, 2021. *Id.* at ¶ 29. Hecker doesn't allege what, exactly, she did at the race. Maybe she directed traffic away from the race path, or maybe she managed the crowd of spectators. She doesn't say. But Hecker re-injured her knee "going up and down the command van stairs" during the race. *Id.* at ¶ 34.

## II.     The Marathon's Immediate Aftermath

A few days later, Hecker saw a doctor because her knee hurt and remained visibly swollen. *Id.* at ¶ 35. After her medical appointment, Hecker texted her supervisors, Sergeant

---

[1] A reader would be forgiven for asking, "what does RDO stand for?" The Court asked the same question. Neither party explained what the acronym means.

4

Hamilton and Lieutenant Karoly Hajdu, and revealed that she had injured her right knee during the race. *Id.* at ¶¶ 36, 46.[2]

The complaint offers a murky chronology about what happened next. First, the complaint says that "[t]hose who were responsible for entering [her] in the system as injured on duty . . . refused to do so." *Id.* at ¶ 37. Second, the complaint alleges that "the watch secretary" "repeatedly reminded" Sergeant Hamilton to add Hecker as injured on duty "in the system." *Id.* at ¶ 38. Third, it says that Hecker "recached [sic] out to Sgt. Hamilton the same day and he stated that it was not his job because [Hecker] did not work in the office anymore. He stated it was Lt. Hajdu's responsibility." *Id.* at ¶ 41.

Hecker's description leaves the reader with a lot of questions, but not a lot of answers.

For starters, Hecker doesn't allege when those events happened. She also doesn't explain what "the system" is, or why it matters. Presumably, she wanted to memorialize the nature and cause of her knee injury within the Department.

Hecker's allegations also seem to contradict one another. On the one hand, Hecker alleges that people refused to add her injury "in the system." But on the other hand, she also alleges that the Department's Medical Section cleared her to return to work with "[u]pdated medical restrictions" on November 2, 2021. *Id.* at ¶¶ 42–43. One way or another, the Department became aware of Hecker's reaggravated knee injury and her need for new accommodations.

After the Medical Section cleared her to return, Hecker texted Sergeant Hamilton and Lieutenant Hajdu about her new restrictions. *Id.* at ¶ 46. But the amended complaint doesn't describe Hecker's new restrictions.

---

[2] Hecker does not provide Sergeant Hamilton's first name in the amended complaint.

5

At some point, Hecker "internally complained to the Medical Section" about "being forced to work the marathon" despite her light duty restrictions. *Id.* at ¶ 44. After filing her internal complaint, Hecker "was advised by Sgt. McCray to clear and report to unit of assignment and let the unit figure it out." *Id.* at ¶ 45.

The Court isn't sure what to make of that allegation. By the sound of things, Sergeant McCray told Hecker to withdraw her report, and to return to work, but it's hard to know for sure. But whatever it meant, Sergeant McCray also told Hecker that human resources would contact her about her complaint. *Id.*

The complaint doesn't offer any details about Sergeant McCray, including his or her first name. Maybe Sergeant McCray works for the Medical Section, or maybe he or she works for human resources. The complaint doesn't reveal when Hecker filed her internal complaint, either. And the complaint doesn't say which "unit" will figure "it out" (or what *it* refers to, specifically).

On November 3, 2021, Hecker returned to work. *Id.* at ¶ 46. Things didn't go smoothly upon her return.

Lieutenant Hajdu "was obviously upset and started interrogating [Hecker] about her restrictions." *Id.* at ¶ 50. Lieutenant Hajdu wanted to verify Hecker's new restrictions. So, he asked Hecker to "look up" her restrictions, and asked Hecker to call human resources, too. *Id.* at ¶¶ 47–48.

What happened next remains unclear. According to Hecker, Lieutenant Hajdu "ordered [her] to tell him that she was not happy. Lt. Hajdu then instructs [sic] the Plaintiff to write a 'voluntary' memo asking to leave the unit, but relates that if she does that she would be sent further outside her medical restrictions." *Id.* at ¶¶ 51–52.

As the Court understands things, Hecker alleges that Lieutenant Hajdu wanted Hecker out of his unit. So, he wanted Hecker to write a memo to initiate her transfer. And it sounded like another unit couldn't accommodate Hecker's work restrictions.

Hecker refused to write the memo. She told Lieutenant Hajdu "that the environment he created was hostile and she felt threatened, intimidated, and uncomfortable." *Id.* at ¶ 53. Hecker left work, and sought assistance from the Fraternal Order of Police. *Id.* at ¶ 54.

Later that day, Lieutenant Hajdu texted Hecker that he "'called the medical section, and [was] going to get clarification.'" *Id.* at ¶ 55. The complaint doesn't say what he wanted clarification about. But an educated guess is that he wanted to know more about Hecker's work restrictions.

An hour or so later, Lieutenant Hajdu asked Hecker to call him. *Id.* at ¶ 56. When Hecker called, Lieutenant Hajdu told her not to come to work until "everything was figured out." *Id.* at ¶ 57.

So, Hecker used "baby furlough days" for the next two days, meaning November 4 and 5. *Id.* at ¶ 58.[3] And on November 4, Hecker emailed the Human Resources Director, Robert Landowski, about her "medical restrictions being violated." *Id.* at ¶ 60. She copied Lieutenant Hajdu on the email. *Id.*

A reader would be forgiven for wondering what restrictions, if any, Lieutenant Hajdu had violated. Again, Hecker never described her restrictions in the first place. Taking the allegations

---

[3] Hecker does not explain what a "baby furlough day" is, or why she took that type of leave. But beyond that, her allegations raise another question. On the one hand, she alleges that her two days off "were never approved from her original slips." *See* Am. Cplt., at ¶ 59 (Dckt. No. 31). Hecker thinks that someone intentionally did not approve her days off "to make it look like she was AWOL." *Id.* But Hecker also says that her days off "were eventually entered, authorized, and approved over a month" later. *Id.* at ¶ 60. It's not entirely clear what Hecker alleges, or why she thinks someone intentionally refused to enter he days off. From the sound of things, her days off were entered and approved.

as true, Lieutenant Hajdu acted inappropriately by violating her (unidentified) restrictions. But even so, Hecker doesn't allege that he made her physically do anything that could have aggravated her knee injury.

In any event, Lieutenant Hajdu called Hecker after receiving her email. *Id.* at ¶ 61. But since Hecker "was in fear of him yelling and badgering her again," she didn't answer, and he didn't leave a voicemail. *Id.*

On November 5, Hecker called the EEOC to report her negative interactions with Lieutenant Hajdu. *Id.* at ¶ 63. Hecker also "filed CR number 2021-0004426" against Lieutenant Hajdu. *Id.* Again, Hecker doesn't provide specifics. This Court assumes that the "CR number" was some type of internal complaint with the Department.

Hecker also alleges that on November 5, her husband (a fellow CPD officer) faced retaliation over Hecker's complaints. Her husband's body camera had been "'randomly' audited . . . less than an hour after Sgt. Patel's phone call." *Id.* at ¶ 64.

Sergeant Patel is new character in this story, but Hecker doesn't provide the reader with many details. Sergeant Patel "was in charge of the body camera unit at this time," and "[i]t is [Hecker's] position that viewing her husband's body camera was done to intimidate her." *Id.*

Most importantly, Hecker doesn't offer any specifics about the phone call with Sergeant Patel. The reader is left wondering why he called, and what was said during the call.

The next day, Hecker filed a complaint against Sergeant Patel on "COPA's Website." *Id.* at ¶ 66. "COPA" is the Civilian Office of Police Accountability. *See Home*, Civilian Office of Police Accountability, https://www.chicagocopa.org/.

### III.    The Marathon's Continuing Fallout

On November 8, 2021, Hecker "was forced" to turn in her badge and apply for "duty disability" benefits. *Id.* at ¶¶ 67, 69. But when Hecker arrived to turn in her badge, "the medical section served her right in the middle of the lobby." *Id.* at ¶ 68.

It's not clear what "served" means in this context. Apparently, Hecker had her "medical history" served "right out in the open, in front of everyone." *Id.* Hecker doesn't provide any more details. Maybe they handed Hecker a stack of papers, or maybe employees blurted Heker's sensitive medical information out loud.

After turning in her badge, Hecker took an unpaid leave of absence from November 8, 2021, through March 24, 2022. *Id.* at ¶ 70.

On March 24, 2022, Hecker received "duty disability." *Id.* at ¶ 73. "It is [Hecker's] position that this would have happened sooner" than March 24, "but the medical section intentionally delayed getting her medical records over to disability board [sic]." *Id.* at ¶ 74.

Hecker doesn't describe "duty disability." Maybe it is a lifelong benefit, or maybe it's not. But one way or another, Hecker remains "an employee but has not physically been to work since 2021." *Id.* at ¶ 12.

At this point, the complaint begins to really suffer, becoming unfocused and rambling. Her complaint wanders on for over 50 paragraphs, introducing 12 new characters and spanning several months. It reads like an unreadable, miniature version of *War and Peace*, without an underlying storyline.

The complaint reads like someone wildly trying to focus a pair of binoculars on a grizzly bear off in the distance while taking a bumpy wildlife safari ride in Yellowstone. At times, it

becomes far too granular, and at other times far too hazy, to understand. The volume and granularity of the allegations interfere with the storytelling (such as it is).

For example, Hecker alleges that she "received an Anesthesia bill comes [sic] in the mail. She forwarded it to Jacqueline Griff of Gallagher Basset, but no [sic] she did not receive an answer." *Id.* at ¶ 87.

That paragraph raises unanswered questions. For starters, the complaint does not explain why Hecker received an anesthesia bill. Maybe Hecker received it for her knee replacement two months before, but that guess is a shot in the dark. *Id.* at ¶ 77.

What's more, this is the first mention of either Jacqueline Griff or Gallagher Basset in the complaint. The complaint mentions Griff only two more times, but never explains who she is or what she does. *Id.* at ¶ 91. Similarly, the complaint mentions Gallagher Basset six times. But the complaint never explains Gallagher Basset's role in this story.

As another example, Hecker alleges that "[a]n email was constructed from city personnel who previously stated they wouldn't have anything to do with plaintiff's care." *Id.* at ¶ 107. Hecker doesn't explain who sent the email, what the email said, or why the email matters. The allegation is plopped in the middle of the complaint without any context or explanation.

Hecker introduces several other doctors, nurses, and health organizations, but doesn't provide a lot of specifics. Suffice it to say that Hecker sought help from medical providers, but had a lot of problems.

Consider a few examples.

In May 2022, Hecker was diagnosed with post-traumatic stress disorder and a depressive disorder. *Id.* at ¶ 76. At some point that month, she received a knee replacement. *Id.* at ¶ 77.

After the knee replacement, the Medical Section provided Hecker with a list of medical providers. *Id.* at ¶¶ 79–88.

By the Court's count, Hecker saw four different medical providers for her knee and mental health during the summer of 2022. *Id.* at ¶¶ 76, 83, 88, 94. But she had problems with most, if not all, of the providers.

At one point, she alleges that a doctor told her that she was a burden to her family and inappropriately "wanted [Hecker] to see his friend who would give her drugs." *Id.* at ¶¶ 82–85. At another point, she claims that she "received a nasty email" from another doctor "for asking a question." *Id.* at ¶ 94. And at some other point, she said that a nurse was supposed to recommend her to a doctor, but the nurse never called Hecker back. *Id.* at ¶¶ 100–01.

Hecker also claims that the Department "denied" her prescriptions on several occasions. *Id.* at ¶¶ 78, 90–93. Hecker alleges that the Department stonewalled her access to physical therapy for a back injury, too. *Id.* at ¶¶ 92, 104–06, 109. Hecker also suggests that the Department violated its collective bargaining agreement by not approving and paying for various medical services. *Id.* at ¶¶ 112, 116.

Meanwhile, in August 2022, the Department told Hecker that she could come back to work despite her knee injury and her mental health challenges. *Id.* at ¶ 89. She alleges that she couldn't return at that time because her knee "was not healed" and she "still had not received mental health care treatment." *Id.*

The complaint alleges that Sergeants Stan Willaims and McCray harassed and intimidated Hecker and her husband. She says that Sergeant Williams threatened to file an internal report on Hecker for repeatedly contacting the Medical Section. *Id.* at ¶ 95. Hecker claims that Sergeant McCray called her husband, harassed him, and disclosed Hecker's sensitive medical information

11

to him. *Id.* at ¶ 96. Apparently, Hecker asked Williams to file an internal complaint against McCray, and Williams never did. *Id.*

The complaint alleges that Hecker was also punished by multiple unnamed people for filing internal complaints about her mistreatment between 2021 and 2023. *Id.* at ¶¶ 122–25. Hecker also claims that she was retaliated against for appearing on a high-profile WGN-TV news investigation, where she discussed the Police Department's shortcomings with treating officers' mental health. *Id.* at ¶ 124; *see also* Patrick Elwood, *Veteran cop fights to address deficiencies within CPD's mental health program*, WGN News, https://wgntv.com/news/wgn-investigates/veteran-cop-fights-to-address-deficiencies-within-cpds-mental-health-program/.

Hecker claims that "[d]ue to the several complaints" she filed, she was "subjected to a hostile work environment, forced to pay for medical treatment out of pocket, forced to pay for medical prescriptions out of pocket, and forced on off duty status without pay twice." *See* Am. Cplt., at ¶ 126 (Dckt. No. 31).

At some unspecified point, Hecker alleges that she could have returned to work. She claims that she "could perform her job duties with a reasonable accommodation." *Id.* at ¶ 113. She alleges that the Department had "several positions available" that could have accommodated her need for "light duty between 2021 and 2023." *Id.* at ¶ 114.

But again, Hecker never came back to work. She wasn't able to return to work as recently as August 2022. She "is considered an employee but has not physically been to work since 2021." *Id.* at ¶ 12.

**IV.**     *Monell*

In addition to her claims about disability discrimination and retaliation, Hecker raises a few constitutional claims.  Hecker alleges that the City violated her constitutional rights by discriminating against her on the basis of her sex and disability.

She doesn't weave those allegations into the rest of her complaint.  Instead, the allegations stand alone on an island.  Hecker gives short shrift to the topics, and doesn't offer any specifics.  Hecker provides no dates or times for any of her allegations.  Most of her allegations are conclusory statements and buzzwords.

Before diving in, the complaint creates confusion by repeatedly switching between "Defendants" (plural) and "Defendant" (singular) in this part of her complaint.  For instance, she says the "actions of *Defendants* against Plaintiff violate her equal protection right to be free from discrimination."  *Id.* at ¶ 136 (emphasis added).  In another paragraph, Hecker says "[b]oth *Defendants* are also liable to Plaintiff for violations of the Fourteenth Amendment."  *Id.* at ¶ 137 (emphasis added).  At the same time, Hecker also writes that the "*Defendant* intentionally subjected Plaintiff to unequal and discriminatory treatment" and that "[t]he actions of *Defendant* were intentional, willful, and malicious."  *Id.* at ¶¶ 135, 142 (emphasis added).

Hecker's suit is against the City, and only the City.  The caption of the complaint doesn't name any other defendant.  *See* Fed. R. Civ. P. 10(a).  The body of the complaint doesn't identify another defendant, either.  And Hecker didn't serve process on any one else.  So there is no one else.

Turning back the substance, Hecker alleges that the Department "altered the terms and conditions of [her] employment, refused to pay her prescriptions, mental health treatments,

accommodate her restrictions, and subjected her to abuse and intimidating behavior and language.  benefits [sic] pending due to her disability and gender."  *Id.* at ¶ 135.

Hecker says that "the decisions to violate [her] equal protection rights to be free from discrimination was [sic] made by an official with final policy-making authority."  *Id.* at ¶ 137. From the sound of things, Hecker says four individuals had final policy-making authority, and used that authority to discriminate against her.  She says "RDO Chief Duane Devries, Sgt. Hamilton, Sgt. Patel, Dr. Arjmond" had a "supervisory and decision making role he CFD [sic], including Plaintiff [sic]."  *Id.* at ¶ 139.  Hecker also says that Chicago "is responsible for the acts of those who acted within the scope of his employment [sic] and pursuant to" Devries, Hamilton, Patel, and Arjmond's final policymaking authority.  *Id*. at ¶ 140.

She also claims that the City violated the Constitution by maintaining a hostile work environment for women.  *Id.* at ¶ 147.  She says that the City's discriminatory practice impacted others, including "Plaintiff, Yvette Cano, Christina Hattenberger, just to name a few."  *Id.*

Hecker alleges that the City forced her, Cano, and Hattenberger to do "the workload of" two male officers "because it was administrative work and deemed a woman's role."  *Id.* at ¶ 148.  She contends that unnamed people also made unspecified "harassing comments and slurs toward [her] and other women, which . . . ultimately create[ed] a hostile work environment."  *Id.*

Hecker rounds out her allegations by saying that the City's "actions violate Section 1983" and that "adverse employment actions were due to Mrs. Hecker's sex."  *Id.* at ¶¶ 149, 152.

## V.      Procedural History

Hecker sued the City on August 5, 2024.  *See* Cplt. (Dckt. No. 1).  After some initial motion practice, Hecker filed an amended complaint on February 3, 2025 (Dckt. No. 35).  That

complaint remains the operative pleading. Hecker also attached her EEOC right-to-sue letter to her amended complaint. *See* EEOC Letter (Dckt. No. 31-2).

The complaint includes five claims under federal and state law.

Count I alleges a violation of the ADA, the Rehabilitation Act, and the Illinois Human Rights Act. Hecker alleges discrimination based on her disability.

Count II is a retaliation claim under the ADA, the Rehabilitation Act, the Illinois Human Rights Act, and the Illinois Whistleblower Act.

Count III alleges a violation of the Illinois Civil Rights Remedies Restoration Act.

The last two claims fall under section 1983, based on alleged violations of the Equal Protection Clause. Count IV alleges sex discrimination, and Count V alleges sexual harassment and a hostile work environment.

The City moved to dismiss. *See* Mtn. to Dismiss (Dckt. No. 35). But after that motion was fully briefed, the City filed a second motion to dismiss. *See* Second Mtn. to Dismiss (Dckt. No. 46).

Initially, this Court dismissed the second motion to dismiss because the City had already filed a motion to dismiss. By the look of things, the City filed a second motion to dismiss without leave of court. *See* 9/10/25 Order (Dckt. No. 55).

Later on, the Court took another look at the City's second motion. As the Court explained in a follow-up minute order, the City made two mistakes when filing its second motion. The City cited the wrong rule, and called the motion the wrong thing.

"Defendant filed a motion for judgment on the pleadings (which it can do), but Defendant invoked Rule 12(b)(6) (which is wrong) instead of Rule 12(c), and called the filing a 'second motion to dismiss' (which is wrong) on CM/ECF instead of a motion for judgment on the

pleadings. So, the motion was wrapped in two layers of erroneous packaging." *See* 1/15/26 Order (Dckt. No. 66).

But once the Court lifted the hood and peered inside, it saw that the City had a point after all. The complaint alleges that Hecker received her EEOC right-to-sue letter on May 7, 2024, and that she sued within 90 days of receiving the letter. *See* Am. Cplt., at ¶¶ 10–11 (Dckt. No. 31).

That representation didn't mesh with the EEOC right-to-sue letter itself. Hecker attached the EEOC letter to her complaint. And the letter is dated January 25, 2024, not May 7, 2024. *See* EEOC Letter (Dckt. No. 31-2). So, the City argued that some of Hecker's claims were untimely, since Hecker did not file her lawsuit within 90 days of January 25.

This Court wanted to get to the bottom of the disconnect. The EEOC letter was dated January 25, 2024, but the complaint said that Plaintiff received it on May 7, 2024. This Court wondered when counsel received the EEOC letter.

The right to sue letter compounded the mystery. This Court noticed a typo in the EEOC's letter when it stated the email address of Hecker's counsel. The letter stated that the EEOC was sending the letter to Plaintiff's counsel at "chj@hall-jacksonandassoicates.com." *See* EEOC Letter (Dckt. No. 31-2).

Notice the misspelling of "associates" in the email address (meaning the email address as typed in the *letter*, not as stated in the email). It should be "associates," but the EEOC wrote "assoicates." The "c" and the "i" were switched around.

That typo in the letter prompted more questions. It raised the question whether the EEOC emailed the letter to the wrong email address. Or maybe the EEOC made typo in the letter, but emailed the letter to the correct email address.

16

So this Court started asking questions. *See* 1/15/26 Order (Dckt. No. 66). This Court ordered Plaintiff's counsel to confirm when she received the EEOC's letter. *Id.*

Plaintiff's counsel responded, but as this Court later put it, her response was "less than satisfactory." *See* 1/26/26 Order (Dckt. No. 68). Counsel didn't address when she *received* the letter, as this Court had asked. Instead, she revealed when she became "aware" of the letter.

Counsel stated: "I declare under penalty of perjury that I did not receive, review, or have any actual knowledge of an email containing a Right-to-Sue notice on January 25, 2024 *that I was aware of* anytime prior to May 2025. Despite maintaining active, regular monitoring of my professional email account chj@hall-jacksonandassociates.com – throughout that period, *no such email was brought to my attention* or filed in my case records at that time." *See* Decl., at 2 (Dckt. No. 67-1) (emphasis added).

Counsel added a self-serving statement that the EEOC's "message was not actually seen, opened, or received by counsel in a way that would put [counsel] on notice of the Right-to-Sue." *See* Resp., at 2 (Dckt. No. 67).

As this Court explained at the time, the phrase "that I was aware of" left a lot to be desired. And the phrase "no such email was brought to my attention" did not inspire confidence. It sounded like counsel got the email on January 25, 2024, but for whatever reason, counsel neglected to read it until May 2024.

So this Court issued a follow-up order, and directed counsel to answer more questions. "This Court asked whether Plaintiff's counsel received the email from the EEOC on January 25, 2024. The response glosses over, and blurs and blends, the receipt and the review of the email." *Id. See* 1/26/26 Order (Dckt. No. 68). This Court expressly ordered counsel to give straight answers.

In her second response, Plaintiff's counsel admitted that she did, in fact, receive the EEOC's right-to-sue letter on January 25, 2024. "Yes. There is an email from the EEOC dated January 25, 2024, in counsel's inbox." *See* Pl.'s Second Resp., at 1 (Dckt. No. 69).

Bingo. So, at long last, this Court got to the bottom of things, and solved the mystery. The EEOC did, in fact, send the right-to-sue letter to the correct email address for Hecker's counsel on January 25, 2024. The EEOC simply botched the email address in the letter. The EEOC send the email to the right email address, and attached a letter with a typo.

At the time, the Court informed the parties that it was "contemplating converting Defendant's motion for judgment on the pleadings to a motion for summary judgment" for Hecker's claims involving the Americans with Disabilities Act and Rehabilitation Act, meaning Counts I and II. *See* 1/29/26 Order (Dckt. No. 70) (citation omitted); *see also* Fed. R. Civ. P. 12(d). The Court invited the parties to file any supplemental submissions. *Id.* The City filed a supplemental submission, but Hecker did not. *See* Def.'s Supp. Brf. (Dckt. No. 72).

This Court has decided to convert the City's motion for judgment on the pleadings to a motion for summary judgment under Rule 12(d). That approach also applies to Hecker's claims under the Illinois Human Rights Act ("IHRA"), which are also in Counts I and II of her complaint.

The Court's Order dated January 29, 2026, did not explicitly mention Hecker's state-law claims under the Illinois Human Rights Act, meaning the claims in Counts I and II. It simply mentioned her ADA and Rehabilitation Act claims.

Even so, claims under the IHRA and the ADA are "practically indistinguishable." *See Tate v. Dart*, 51 F.4th 789, 7903 (7th Cir. 2022); *see also Fox v. Adams & Assocs., Inc.*, 2020 IL App (1st) 182470, 166 N.E.3d 772, 783–88 (2020). Claims under those two statutes rise and fall

18

together. *See, e.g., Lohmeier v. Gottlieb Mem'l Hosp.*, 147 F.4th 817, 830 (7th Cir. 2025); *see also Suvada v. Gordon Flesch Co., Inc.*, 2013 WL 5166213, at *11 (N.D. Ill. 2013).

This Court gave the parties notice that it was considering the possibility of converting the motion for judgment on the pleadings into a motion for summary judgment for the claims under the ADA and the Rehabilitation Act. So, for all intents and purposes, the Court gave adequate notice for the IHRA claims, too.

Here's the punchline. This Court will treat the motion for judgment on the pleadings as a motion for summary judgment for the claims under the ADA, the Rehabilitation Act, and the Illinois Human Rights Act, meaning Counts I and II. To that end, the Court will consider the parties' supplemental submissions and exhibits, including the emails between Plaintiff's counsel and the EEOC.

This Court will go a different procedural route for the three other claims. The Court will address the motion to dismiss those three claims under Rule 12(b)(6).

**Legal Standards**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**Analysis**

**I.** **Failure to Accommodate and Retaliation Claims (Counts I and II)**

The first two claims fall under Title I of the ADA, Section 504 of the Rehabilitation Act, and the Illinois Human Rights Act. The first claim alleges that the City failed to reasonably accommodate her disability. The second claim alleges retaliation.

20

The claims are going nowhere fast. Hecker brought them too slowly.

The ADA requires a plaintiff to obtain a right-to-sue letter from the EEOC before filing suit. *See* 42 U.S.C. § 2000e–5(f)(1). After getting a right-to-sue letter, a plaintiff is on the clock. A plaintiff has only 90 days to bring a claim.

"Under the ADA a plaintiff must file suit within ninety days of receiving notice of his right to sue." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 600 (7th Cir. 2009). "[T]he filing window begins when a claimant or his attorney 'actually receives' the right-to-sue notice that accompanies the agency's final decision." *Lax v. Mayorkas*, 20 F.4th 1178, 1182 (7th Cir. 2021); *see also* 42 U.S.C. § 2000e–5(f)(1) (providing that "within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge"); 29 C.F.R. § 1614.407(a) (stating that a plaintiff must file suit "[w]ithin 90 days of receipt of the agency final action").

The same 90-day deadline applies to claims under Section 504 of the Rehabilitation Act. *See Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009); *see also Malone v. Illinois Dep't of Corr.*, 2009 WL 2982816, at *2 (N.D. Ill. 2009); *Phillips v. Illinois Dep't of Corr.*, 2010 WL 3523001, at *1 (N.D. Ill. 2010).[4]

---

[4] For an interested reader, here's a lengthier explanation about why employment discrimination plaintiffs must administratively exhaust their Rehabilitation Act claims. Hecker sues under Section 504 of the Rehabilitation Act, codified as 29 U.S.C. § 794. *See* Am. Cplt., at ¶ 19 (Dckt. No. 31). That provision provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 *et seq.*) . . . ." *See* 29 U.S.C. § 794(d). So, the Rehabilitation Act incorporates Title I of the ADA, including 42 U.S.C. § 12117. In turn, section 12117 requires that "any person alleging discrimination on the basis of disability" follow the "procedures set forth in . . . 2000e-5." *See* 42 U.S.C. § 12117(a). And section 2000e-5 requires a plaintiff to file a charge with the EEOC, obtain a right-to-sue letter, and file suit in federal court within 90 days of receiving the letter. *See* 42 U.S.C. § 2000e-5(f)(1).

Hecker had 90 days to bring her state-law claim under the IHRA, too. *See* 775 ILCS 5/7A–102(D)(3), (D)(4); *see also Goodlet v. City of Chicago*, 2024 WL 3105883, at *5 (N.D. Ill. 2024); *Bowers v. City of Chicago*, 2024 WL 3888877, at *2 (N.D. Ill. 2024). But under state law, the 90-day period began to run when she exhausted her administrative remedies and received authorization from the Illinois Department of Human Rights.

Based on the record, Hecker filed her lawsuit several months too late. The story begins on January 19, 2024, when Hecker's counsel sent an email to the EEOC and requested a right to sue letter. *See* 1/19/24 Email (Dckt. No. 46-2).

The EEOC responded a few days later, and said that the letter would come from someone at the DOJ. *See* 1/22/24 Email (Dckt. No. 46-3). Hecker's counsel thanked the EEOC employee for his "prompt attention to this matter." *See* 1/22/24 Email (Dckt. No. 46-3).

On January 25, 2024, Hecker's counsel received an email with the right to sue letter from Adams-Simmons from the DOJ. The email called attention to the attached right to sue letter. "Attached is your client's ADA Notice of Right to Sue . . . . Your 90-day period begins with your receipt of the Notice." *See* 1/25/24 Email (Dckt. No. 46-1).

Hecker's counsel did, in fact, receive that email with the right to sue letter, as she confirmed in response to this Court's questions. Maybe she didn't *read* it. But she got it.

And then, nothing happened. Months ticked away, but Hecker didn't file suit.

Instead, on May 7, 2024, Hecker's counsel emailed the DOJ and asked for an "update on our request for a right to sue." *See* 5/7/24 Emails (Dckt. No. 67-2). Later that day, Adams-Simmons responded by reminding Hecker's counsel that the EEOC had already processed the request. "This request was processed 1/25/2024, see attached." *Id.* Hecker's counsel responded, "[r]eceived and thanks." *Id.*

The upshot is simple.  Hecker's counsel received the right-to-sue letter from the EEOC on January 25, 2024.  That letter started the clock ticking.  The deadline to file suit was April 24, 2024, meaning 90 days after getting the letter.

Hecker missed the deadline, and it wasn't a photo finish.  Hecker filed the complaint on August 5, 2024.  That's 193 days after January 25, 2024.  So Hecker filed suit too late.  She missed the deadline by 103 days.

By the sound of things, counsel received the right to sue letter on January 25, 2024, but didn't look at it until May 2024.  Maybe so.  But the statutory text confirms that the starting point is "the *giving* of such notice," not when counsel gets around to reading it.  *See* 42 U.S.C. § 2000e–5(f)(1) (emphasis added).

A failure to read a right to sue letter in a timely manner is not a reason to extend the 90-day deadline.  "[T]he 90-day Title VII clock begins ticking not when the plaintiff reads the right-to-sue letter, but as soon as the plaintiff is on notice the letter has issued." *See Kinder v. Marion Cnty. Prosecutor's Off.*, 132 F.4th 1005, 1008 (7th Cir. 2025).  "[R]eceiving the notice via traditional mail, without opening or reading that notice, is sufficient to trigger the beginning of the filing period." *Lax*, 20 F.4th at 1182; *see also Prince v. Stewart*, 580 F.3d 571, 574 (7th Cir. 2009).

In *Kinder*, the plaintiff's counsel received an email from the EEOC stating that the plaintiff's "charge was closed with the EEOC." *See Kinder*, 132 F.4th at 1009.  But the lawyer didn't receive the actual right-to-sue letter for several weeks.  Even so, that initial email "start[ed] the countdown" to sue because the email notified the parties that a right-to-sue letter was issued. *Id.*  Basically, receiving an email about a forthcoming right to sue letter is "notice" within the meaning of the statute.

23

Receiving an email with a right to sue letter starts the clock ticking, even if counsel doesn't read the letter until later. "The determinative issue, then, is whether [plaintiff's] mere receipt of the email commences the filing window, or whether he must have opened and read the attachment to that email to commence the filing window. We hold that [plaintiff's] filing window for purposes of 42 U.S.C. § 2000e-5(f)(1) and 29 C.F.R. § 1614.407 commenced when he received the email, not when he opened the attachment." *See Lax*, 20 F.4th at 1182.

"[T]he date of receipt, which triggers the filing window, is unaffected by the recipient's failure to read the notice until a later time." *Id.* at 1183.

The same conclusion applies here. The clock started ticking when Hecker's counsel "received the email," not when she "opened the attachment." *Id.* at 1182. Her "failure to read the attachment until a later time" makes no difference, because getting the email started the clock. *Id.* at 1183.

The Seventh Circuit has left the door slightly ajar, leaving a little room for the possibility of equitable tolling. But it's a narrow opening. After all, the statute drew a bright-line rule, and courts must respect the deadline set by Congress. That's why courts resort to equitable principles sparingly.

Getting around a statutory deadline, based on principles of equity, requires an extraordinary reason. "Equitable tolling . . . is reserved for situations in which the claimant has made a good faith error (*e.g.*, brought suit in the wrong court) or has been prevented in some extraordinary way from filing his complaint in time." *See Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001) (cleaned up); *see also Kinder*, 132 F.4th at 1009 ("[I]f unusual circumstances prevent a plaintiff from reading a letter, the question arises whether the deadline

24

should be equitably tolled. That doctrine provides relief when a claimant is 'prevented in some extraordinary way from filing his complaint in time.'") (quoting *Lax*, 20 F.4th at 1183).

"Courts may extend statutory deadlines when external obstacles that are both extraordinary *and* beyond a party's control prevent timely filing." *Kinder*, 132 F.4th at 1009 (cleaned up) (emphasis in original). In discrimination cases, courts apply equitable tolling "in only three circumstances: when a plaintiff exercising due diligence cannot within the statutory period obtain the information necessary to realize that she has a claim; when a plaintiff makes a good-faith error such as timely filing in the wrong court; or when the defendant prevents a plaintiff from filing within the statutory period." *See Porter v. New Age Servs. Corp.*, 463 F. App'x 582, 584 (7th Cir. 2012) (citations omitted).

This case doesn't come close to satisfying that high standard. Counsel explained that her "failure to act on the January 25, 2024, email was not the result of bad faith, strategic delay, or disregard of court rules. The email – although present in the inbox – was never opened, read, or acknowledged . . . ." *See* Pl.'s Second Resp., at 2–3 (Dckt. No. 69). That's not enough.

Run-of-the-mill neglect isn't an extraordinary reason for missing a statutory deadline. That's why a failure to read a notice from the government is not a basis for equitable tolling. "To say that a claimant who receives the notice but does not read it or ask his attorney to explain it within the 90 days should be exempt from the limitations period under the principle of equitable tolling renders the procedural rule itself meaningless." *See Threadgill*, 269 F.3d at 850.

Hecker's claim under the IHRA was late, too. In fact, she missed the deadline by an even greater margin.

A plaintiff must exhaust her administrative remedies through the Illinois Department of Human Rights before bringing a claim under the IHRA. *See Prinicpe v. Village of Melrose*

*Park*, 2020 WL 4815908, at \*4–5 (collecting cases); *see also* 775 ILCS § 5/7–102(A-1)(3)(a). That is, Hecker needed authorization from the Illinois Department of Human Rights before bringing her state-law claim. That requirement is separate and apart from the need for a right to sue letter from the EEOC. *See Prinicpe*, 2020 WL 4815908, at \*5; *see also Perez v. Cook Cty. Sheriff's Office*, 2020 WL 777288, at \*3 (N.D. Ill. 2020) (stating that the EEOC right-to-sue letter "cannot be used as a substitute" for administrative exhaustion "regardless of the workshare agreement" between the EEOC and IDHR); *Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 921, 929–30 (N.D. Ill. 2014); *Anderson v. Ctrs. for New Horizons, Inc.*, 891 F. Supp. 2d 956, 959–60 (N.D. Ill. 2012).

The same 90-deadline applies. That is, a plaintiff has 90 days to file suit after receiving authorization from the IDHR. *See* 775 ILCS 5/7A–102(D)(3), (D)(4).

Hecker exhausted her administrative remedies and received authorization from the IDHR to file suit on December 4, 2023. *See* IDHR Notice of Dismissal (Dckt. No. 36-1). So, Hecker had 90 days from December 4, 2023, to file a lawsuit, meaning by March 4, 2024. *See* 775 ILCS 5/7A–102(D)(3), (D)(4).

Hecker filed her complaint in August 2024, five months after the deadline. And even then, that complaint didn't include a claim under the IHRA. Hecker first raised a claim under the IHRA in her amended complaint on February 3, 2025.

In sum, Hecker's claims under Title I of the ADA, Section 504 of the Rehabilitation Act, and the Illinois Human Rights Act are untimely. The Court grants summary judgment to the City on the first two claims.

\*     \*     \*

26

The motion for summary judgment applied to the first two claims (only). For all remaining claims, the Court will address the motion to dismiss for failure to state a claim.

## II. Civil Rights Remedies Restoration Act (Count III)

The next claim falls under the Illinois Civil Rights Remedies Restoration Act ("CRRRA"). *See* Am. Cplt., at ¶¶ 132-33 (Dckt. No. 31); *see also* 775 ILCS 60/15.

A claim under the Civil Rights Remedies Restoration Act requires a predicate violation of federal law. A plaintiff must show that the defendant violated one of the federal statutes identified in the state statute. *See* 775 ILCS 60/15; *see also Coachman v. Gateway Foundation, Inc.*, 2026 WL 1533847, *7 (N.D. Ill. 2026); *see also Bradley v. Hain*, 2024 WL 4753688, at *6 (N.D. Ill. 2024).

Only one of the federal statutes is relevant here. "A violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) . . . shall constitute a violation of this Act." *See* 775 ILCS 60/15. This Court granted summary judgment for the City of Chicago on Hecker's Rehabilitation Act claims, so Hecker cannot state a CRRRA claim.

Count III is dismissed.

## III. *Monell* Claims

The next two claims are discrimination claims against the City. But they don't arise under Title VII, or the ADA, or any comparable statute. Instead, Hecker brings claims under the Constitution, and uses section 1983 as a statutory hook.

Count IV alleges sex and disability discrimination. Count V alleges sexual harassment and a hostile work environment.

27

### A.   Sex and Disability Discrimination (Count IV)

Count IV alleges that the City discriminated against Hecker on the basis of her sex and disability in violation of the Equal Protection Clause. *See* Am. Cplt., at ¶¶ 134–43 (Dckt. No. 31). Since this is a constitutional claim against the City, *Monell* applies.

A municipality is responsible for its own conduct, and *only* its own conduct. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Respondeat superior is off the table. A municipality is not vicariously liable for the constitutional torts of its employees.

A plaintiff must prove that a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," caused the constitutional violation. *Id.*; *see also First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) ("[T]o prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself.").

*Monell* claims are not subject to a heightened pleading standard. *See Est. of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2).

That said, while there is no heightened pleading standard for *Monell* claims, there isn't a lower standard, either. As always, conclusory allegations and formulaic recitations of the elements of a claim aren't enough. *See Estate of Sims*, 506 F.3d at 514; *Iqbal*, 556 U.S. at 678–79; *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009); *Porter v. Bd. of Educ. of City of Chicago*, 2018 WL 1942671, at *8 (N.D. Ill. 2018) ("Bare assertions that such policies existed, without more, will not suffice."). Raw conclusions are not entitled to a presumption of truth, either. *See*

28

*McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 680–81).

Three scenarios can give rise to municipal liability under section 1983:  "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."  *First Midwest*, 988 F.3d at 986; *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).[5]

In Count IV, Hecker brings a *Monell* claim under the third theory, meaning that her injury was caused by people with final policymaking authority.  *See* Am. Cplt., at ¶ 137 (Dckt. No. 31).

"The determination of whether a person has policymaking authority is a question of state law and is to be decided by the court."  *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (citation omitted).  "In order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'"  *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)).

---

[5]  Before holding a municipality responsible, there must be something to hold the municipality responsible *for*.  That is, "the plaintiff must begin by showing an underlying constitutional violation, in order to move forward with her claim against the municipality."  *See Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009); *see also First Midwest*, 988 F.3d at 987.  "The Equal Protection Clause of the Fourteenth Amendment protects against state discrimination on the basis of sex . . . ."  *See Scott v. Illinois Youth Ctr.*, 2009 WL 10712893, at *3 (N.D. Ill. 2009) (citing *Bohen v. City of East Chicago*, 799 F.3d 1180, 1185 (7th Cir. 1986).  Disability discrimination can violate the equal protection clause, too.  *See, e.g.*, *Bozzi v. Cook Cnty. Sheriff's Off.*, 2024 WL 3226576, at *11–12 (N.D. Ill. 2024) (Maldonado, J.); *see also Haney v. Pritzker*, 563 F. Supp. 3d 840, 865–66 (N.D. Ill. 2021).

"For the purposes of Section 1983, policymaking authority is 'not simply the power to make decisions;' it is broader and must encompass the power to speak for the local government on official policy." *Richardson v. Bd. of Educ. of Elgin Sch. Dist.*, 2025 WL 1707801, at *3 (N.D. Ill. 2025) (quoting *Darchak v. City of Chicago Bd. of Educ.*, 680 F.3d 622, 630 (7th Cir. 2009)). "[T]he relevant question in a *Monell* claim is not who makes *decisions* but who makes *policy*." *See Galvan v. City of Chicago*, 2025 WL 1807984, at * (N.D. Ill. 2025) (emphasis in original). To be a final policymaker, a "municipality must have delegated authority to the individual to make policy on its behalf." *See Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014).

Hecker has the burden of alleging facts demonstrating that individuals have final policymaking authority. *See, e.g.*, *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001); *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 620 (7th Cir. 2001).

Hecker alleges that RDO Chief Duane Devries, Sergeant Hamilton, Sergeant Patel, and Dr. Arjmond were final policymakers who discriminated against her. *See* Am. Cplt., at ¶¶ 137–39 (Dckt. No. 31).

Hecker's claim fails for two related but independent reasons.

For starters, courts have held that police superintendents, chiefs, sergeants, and lieutenants are not final policymakers for the City of Chicago as a matter of law. *See, e.g.*, *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) (Easterbrook, J.) (holding that the Chicago Police Department's Police Superintendent – a position higher than a sergeant – is not a final policymaker in discriminatory employment decisions because employment discrimination violates policies set by the City Council); *Thayer v. Chiczewski*, 2007 WL 3447931, at *6 (N.D. Ill. 2007) ("Seventh Circuit case law has acknowledged that Illinois does not support the

conclusion that police officers, even a police superintendent, constitute a final policymaker.") (collecting cases); *Latuszkin*, 250 F.3d at 505 ("For example, the only specific individuals identified by Mr. Latuszkin as failing to stop the parties are CPD superior officers and supervisors at District 25. These individuals do not qualify as policymakers for the City."); *Johnson v. Sandidge*, 87 F. Supp 2d 832, 835 (N.D. Ill. 1999) ("Plaintiffs ask us to infer that Sergeant Murphy had final policymaking authority merely because he held the title of 'sergeant.' However, the plaintiffs have not alleged a single fact to support this claim, and their contention flies squarely in the face of Seventh Circuit precedent holding that police sergeants are *not* policymakers.") (emphasis in original).

In addition, Hecker alleges zero facts demonstrating that any of these four individuals have final policymaking authority. Hecker alleges that "[t]he City employed" these four individuals "in a supervisory and decision making role." *Id.* at ¶ 139. She also says that the City is "liable to Plaintiff for violations of the Fourteenth Amendment . . . because the decisions to violate plaintiff's equal protection rights [sic] to be free from discrimination was made by an official with final policy-making authority." *Id.* at ¶ 137.

Hecker's allegations don't cut it. Plaintiffs cannot make conclusory allegations about an individual's policymaking authority. Courts routinely dismiss *Monell* claims when a plaintiff fails to sufficiently allege that an individual has final policymaking authority. *See e.g.*, *Avitia v. City of Chicago*, 2024 WL 2274101, at *8 (N.D. Ill. 2024) ("Other than including their titles as sergeants, the complaint does not contain any factual allegations about Officers Murphy and Bickham's authority. The Court cannot infer that these officers had final policymaking authority merely because they held the title of sergeant.") (internal citation omitted); *Horwitz*, 260 F.3d at 620 (affirming the dismissal of section 1983 claims where plaintiff did not allege any basis to

31

conclude that individual defendants were final policymakers, explaining that "*Monell* places the burden on [the plaintiff] to demonstrate that an official policy or custom of the [defendant's] caused her injury."); *Lyttle v. Killackey*, 528 F. Supp. 2d 818, 828–29 (N.D. Ill. 2007) ("Here, Lyttle pleads in a conclusory fashion that the officers were delegated final policymaking authority . . . Accordingly, Lyttle fails to plead facts that would plausibly entitle him to relief on the basis that the City delegated final policymaking authority to police officers."); *Klingler v. City of Chicago*, 2017 WL 3394722, at *1–2 (N.D. Ill. 2017) (dismissing a final policymaker claim against a commander in the Chicago Police Department because "there [were] no factual allegations from which the Court [could] plausibly infer that policymaking authority was delegated to Commander Valgouris without being subject to review and/or override by his superiors in the police department"); *Connelly v. Cook Cnty. Assessor's Off.*, 583 F. Supp. 3d 1142, 1149 (N.D. Ill. 2022) (dismissing a complaint for merely alleging that a defendant "was the final policymaker" without alleging any specific facts demonstrating that the defendant "possessed or was delegated final policymaking authority"); *Okoro v. Cook Cnty. Health & Hosp. Sys.*, 2022 WL 1266432, at *4 (N.D. Ill. 2022) (dismissing final policymaker claim when the complaint offered no allegations "support[ing] any inference that [the defendant] had anything to do with [the plaintiff's] termination"); *Galvan*, 2025 WL 1807984, at *8 (dismissing a plaintiff's claims that alleged that a Deputy Chief in the Chicago Police Department had "final decision making authority to discipline and transfer" the plaintiff, but "pleaded no facts that allow the inference that [the defendant] . . . had authority to make policy."); *Mahran v. Cnty. of Cook*, 2022 WL 11169418, at *5 (N.D. Ill. 2022) ("Beyond the conclusory assertion that Dr. Norwood is a final policymaker, however, the complaint does not allege that Dr. Norwood

32

possessed the authority to set policy for hiring and firing. For this reason, Plaintiff insufficiently alleges a Monell final policymaker theory.").

The complaint does not adequately alleged that any of the four individuals had final policymaking authority. So, her *Monell* claim doesn't satisfy run-of-the-mill pleading standards. No one is raising the bar. Hecker just can't clear the standard height of Rule 12(b)(6).

For those reasons, Count IV is dismissed.

## IV.   *Monell* **Claim for Sexual Harassment and a Hostile Work Environment (Count V)**

In Count V, Hecker brings another *Monell* claim under section 1983. She alleges that the City maintained a "widespread pattern and practice" of sexual harassment and a hostile work environment in violation of the Fourteenth Amendment. *See* Am. Cplt., at ¶¶ 144–53 (Dckt. No. 31).[6]

So, Hecker brings Count V under a "widespread practice" theory of municipal liability. *See First Midwest*, 988 F.3d at 986 (noting that three scenarios give rise to municipal liability under section 1983, including "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice").

To prevail on a "widespread practice" claim, Hecker must show that the City's practices were "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *See Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on*

---

[6]  Once again, Hecker must plead a constitutional violation as a threshold issue. Hecker does so. "[S]exual harassment constitutes sex discrimination in violation of the equal protection clause and is actionable under § 1983." *See Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) (cleaned up); *see also Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006) ("Sexual harassment by a state employer constitutes sex discrimination in violation of the equal protection clause.")

*other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *see also Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

There is no bright-line rule defining a widespread custom or practice. But "it is clear that a single incident – or even three incidents – do not suffice." *See Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014); *see also Carmona v. City of Chicago*, 2018 WL 306664, at *2 (N.D. Ill. 2018) ("[A] plaintiff pursuing a widespread practice claim generally must allege more than one, and sometimes more than three, instances of misconduct."). And all the incidents need to be sufficiently similar to one another to support an inference of a broader pattern. *See, e.g., Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021).

To plead a widespread practice, a plaintiff needs to allege more than a few of their own personal experiences. "Courts in this District regularly dismiss *Monell* claims where the plaintiff has failed to allege instances other than that from which he suffered." *Carmona*, 2018 WL 306664, at *2; *see also Arita v. Wexford Health Sources, Inc.*, 2016 WL 6432578, at *2 (N.D. Ill. 2016) (rejecting a *Monell* claim because plaintiff's own experiences were the only allegations of misconduct); *Taylor v. Wexford Health Sources, Inc.*, 2016 WL 3227310, at *4 (N.D. Ill. 2016) (same); *Winchester v. Marketti*, 2012 WL 2076375, at *4 (N.D. Ill. 2012) ("What is fatal to the *Monell* claims, however, is that Plaintiff makes no attempt to plead a pattern of similar constitutional violations with any degree of factual specificity."); *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835, 841 (N.D. Ill. 2020) (dismissing a complaint that "rests entirely on [plaintiffs'] own personal experiences [because] [t]hey allege no other examples of the City releasing the wrong information to the wrong recipients").

And Hecker must sufficiently allege a hostile work environment. An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation,

34

ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023). "The elements of a hostile work environment claim are the same under § 1983 as under Title VII." *See Vasquez v. City of Chicago*, 2022 WL 23035219, at *11 (N.D. Ill. 2022) (citing *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 835 (7th Cir. 2015)).

Hecker alleges that the City discriminated against "[f]emale employees such as Plaintiff, Yvette Cano, Christiana Hattenberger, just to name a few." *See* Am. Cplt., at ¶ 147 (Dckt. No. 31). According to Hecker, the City's "discriminatory pattern and practices included forcing the plaintiff and other women such as Yvette Cano and Christiana, to [sic] do the workload of Vince Macias (Male) Angelo P. (Male) [sic], and Karoly Hajdu (Male) because it was administrative work and deemed a woman's role. This also including [sic] harassing comments and slurs towards Plaintiff and other women . . . ultimately creating a hostile work environment." *Id.* at ¶ 148.

Count V is dismissed for several reasons.

For starters, Hecker's complaint is barebones. She provides no details. The reader is left in the dark about who, exactly, forced Hecker and other women to do administrative work. Hecker claims that such work was "deemed a woman's role," but doesn't say by whom. She doesn't provide a single example of a "harassing comment or slurs" that she or other women received. *Id.* at ¶ 148. The Court has no sense of when any such comments (if any) were made, or by whom, let alone how severe or pervasive the comments were in the workplace.

Courts regularly dismiss hostile work environment claims when they are vague, conclusory, or barebones. *See, e.g.*, *Salgado v. Graham Enter. Inc.*, 2019 WL 3555001, at *3

35

(N.D. Ill. 2019) ("These barebones allegations do not allow the Court to infer that a reasonable person would find the environment hostile nor do they demonstrate how the harassment unreasonably interfered with Salgado's work performance. For example, Salgado's complaint does not include allegations that demonstrate the frequency or severity of the racial slurs."); *Boniface v. Westminster Place*, 2019 WL 479995, at *3 (N.D. Ill. 2019) (dismissing plaintiff's claim because her allegations were vague and the complaint contained "no specific allegations suggesting that any conduct was physically threatening or verbally abusive or how it interfered with her work performance"); *Stone v. Bd. of Trs. of N. Ill. Univ.*, 38 F. Supp. 3d 935, 945 (N.D. Ill. 2014) (dismissing plaintiff's claim because "there is no factual allegation which would plausibly suggest either the severity or pervasiveness of the identified harassment").

In fact, courts have dismissed more serious allegations than Hecker's allegations at the pleading stage. *See, e.g.*, *Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 990–91 (N.D. Ill. 2016) (dismissing a hostile work environment claim despite allegations that a supervisor pulled plaintiff's hair, inspected her scalp, and screamed at her on multiple occasions, and that other coworkers laughed at her, gave her dirty looks, and ostracized her).

Hecker provides no factual allegations that could give rise to a plausible inference that she endured severe or pervasive harassment. That's fatal to the claim.

Count V fails for another reason, too. Hecker's claim is time-barred. "In Illinois, the statute of limitations period for § 1983 claims is two years." *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). Hecker sued in August 2024, which means her suit is limited to harassment stemming from August 2022 onward.

But there's a glaring problem. Hecker "has not physically been to work since 2021." *See* Am. Cplt., at ¶ 12 (Dckt. No. 31). Hecker didn't experience a hostile work environment within

36

two years of her complaint because she hadn't been at work for over three years by the time she sued.

Hecker can't raise a hostile work environment claim if she hasn't been in *any* work environment within the statute of limitations. *See, e.g.*, *Sibert v. Des Plaines Sch. Dist. 62*, 2017 WL 3219268, at *2 (N.D. Ill. 2017) ("It is difficult to conceive how [the plaintiff] could have been working in a hostile work environment when he was on leave and not at work."); *Kerner v. Georgia-Pac. Wood Prod., LLC*, 2017 WL 4712227, at *5 (W.D. Wis. 2017) ("Plaintiff cannot prove she was subjected to a hostile work environment during a time in which she was absent from work."); *Clemens v. Speer*, 2017 WL 2684101, at *7 (W.D. Wis. 2017) ("The court agrees with defendant that plaintiff has not adequately pleaded a hostile work environment claim here. Most fundamentally, plaintiff was *absent* from the workplace during the entire time he alleges that he was subjected to a hostile work environment.") (emphasis in original). There can't be a hostile work environment when there *is no* work environment.

For those reasons, Count V is dismissed.

## V.     Supplemental Jurisdiction (Count II)

The last claim is Hecker's retaliation claim under the Illinois Whistleblower Act ("IWA"). She raised her IWA claim as part of Count II. The IWA bars employers from retaliating against employees who, among other things, alert government investigators to employer wrongdoing. *See* 740 ILCS 174/15.

This Court has supplemental jurisdiction over this state-law claim because it was part of the same controversy as Hecker's federal claims. *See* 28 U.S.C. § 1367(a). But this Court either granted summary judgment against, or dismissed, all of Hecker's federal claims (and all her other state-law claims, too). So, the original jurisdictional hook over this claim is gone.

37

In that situation, a district court can keep jurisdiction over the state-law claims, but it doesn't have to keep jurisdiction. Most of the time, the best course is to let state courts decide state-law claims against state actors.

A federal court "may decline to exercise supplemental jurisdiction" over a state-law claim if "the district court has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c)(3). And the "usual practice in this circuit is for district courts to 'dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.'" *See Hagan v. Quinn*, 867 F.3d 816, 830 (7th Cir. 2017) (quoting *Grace v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999)).

Other courts in this district have declined supplemental jurisdiction over IWA claims. *See Rongere v. City of Rockford*, 2023 WL 3063183, at *6 (N.D. Ill. 2023); *see also Galvan v. City of Chicago*, 2025 WL 1807984, at *8 (N.D. Ill. 2025). In *Rongere*, a former city worker sued the City of Rockford for discrimination and retaliation. After dismissing her federal claims, the district court was left with a plaintiff's IWA claim. That court relinquished supplemental jurisdiction. "It is better for the Illinois courts to resolve whether plaintiff has a claim against defendant under these circumstances, so the court relinquishes supplemental jurisdiction over the Whistleblower Act claim." *Rongere*, 2023 WL 3063183, at *6; *see also Galvan*, 2025 WL 1807984, at *8 (declining supplemental jurisdiction over IWA claims).

This Court agrees, and declines supplemental jurisdiction over Hecker's IWA claim. *See* 28 U.S.C. § 1367(c)(3).

## Conclusion

For the foregoing reasons, this Court grants summary judgment to the City for the claims under the ADA, the Rehabilitation Act, and the Illinois Human Rights Act (Counts I & II). The

motion to dismiss the state-law claim under the Illinois Civil Rights Remedies Restoration Act (Count III) is granted. The motion to dismiss the *Monell* claims under section 1983 (Counts IV & V) is granted. The Court declines to exercise supplemental jurisdiction over the state-law claims under Illinois Whistleblower Act (meaning part of Count II).

Date: August 7, 2026

Steven C. Seeger
United States District Judge